

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-15-00343-CV
_____

NANCY HIGGINSON, DEBBIE CHEADLE, EDWARD CHEADLE,
ARTHUR CHEADLE, WAYNE CARSON, FINNEY CHEADLE,
CHERYL SHOOP, AND KEITH SAWAYA, APPELLANTS

V.

RAEANNE MARTIN, APPELLEE

On Appeal from the 72nd District Court
Lubbock County, Texas
Trial Court No. 2013-506,513; Honorable Ruben G. Reyes, Presiding

February 14, 2017

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

This is an interlocutory appeal concerning the propriety of the trial court's vacation of an arbitration award. By a single issue, Appellants, Nancy Higginson, Debbie Cheadle (a/k/a Debra Cheadle), Edward Cheadle, Arthur Cheadle, Wayne Carson, Finney Cheadle, Cheryl Shoop, and Keith Sawaya, contend the trial court erred in the following ways: (1) by vacating the award of an arbitration panel and (2) by

ordering the parties to trial instead of confirming that award. Appellee, Raeanne Martin, contends the trial court did not err for two reasons: (1) the arbitration panel exceeded its powers by awarding relief not authorized by the agreement of the parties and (2) the arbitration panel exceeded its power by arbitrating a dispute that had been settled by the parties. We affirm the decision of the trial court.

BACKGROUND

All of the parties to this dispute are shareholders of Russell E. Womack, Inc., a closely-held Texas corporation (herein the "Corporation").[1] Prior to the events in controversy, through inheritance and transfer, three groups of individuals had come to own 100 percent of the shares of the Corporation: (1) Appellants, (2) Appellee, and (3) the Byrne parties[2] (Michael Byrne, Richard Byrne, James Byrne, Jr., Barbara Holladay, West Womack, and Carolyn Cain).[3] At the time of the underlying suit, Nancy Higginson and Michael Byrne were co-presidents of the Corporation. None of the three groups owned or controlled a majority of the shares of the Corporation.

In late 2007, after the final disposition of Womack's estate, Nancy Higginson and Andrew Stewart, the Corporation's attorney, proposed an arrangement to consolidate the voting power of the Higginson side of the family in order to obtain control of the Corporation. Appellee's reservations about the proposed arrangement were assuaged when Stewart offered to include a clause allowing her to opt out of the arrangement.

---

[1] A corporation is "closely held" if it has fewer than thirty-five shareholders and its stock is not publically traded. *See* TEX. BUS. ORGS. CODE ANN. § 21.563 (West 2012).

[2] The Byrne parties are not parties to this appeal.

[3] The Corporation was founded by Russell E. Womack. Appellants and Appellee are all related on one side of Mr. Womack's family while the Byrnes parties are all related on another side of Mr. Womack's family.

2

Thereafter, on December 31, 2007, certain Appellants and Appellee entered into an agreement, the *Voting Trust Agreement*, for the purpose of consolidating the voting power of their shares.[4] Pursuant to that agreement, Nancy Higginson and Debbie Cheadle were named as the Trustees with the authority to vote the shares of the parties to that agreement "in their unrestricted discretion." Article 8 of the *Voting Trust Agreement* included a revocation option that permitted Appellee and her brother, Wayne Carson, to opt out of the agreement.[5]

The next day, on January 1, 2008, the parties to the *Voting Trust Agreement* also entered into an agreement, the *Shareholders' Agreement*, whereby they agreed to restrict the transfer of their shares. Specifically, the *Shareholders' Agreement* provided a right of first refusal concerning the transfer of shares.[6] The *Shareholders' Agreement*

---

[4] The *Voting Trust Agreement* was an agreement between Appellee, Raeanne Martin, and Appellants, Nancy Higginson, Debra A. Cheadle, Edward Cheadle, as personal representative of Camile Sawaya, Deceased, Arthur Cheadle, and Wayne Carson. Appellants, Finney Cheadle, Cheryl Shoop, and Keith Sawaya, were not parties to the agreement.

[5] Article 8.1(a) of the *Voting Trust Agreement* provided the terms and conditions on which Appellee and her brother, Wayne Carson, could revoke their *Voting Trust Certificate* and terminate participation in that agreement.

[6] 3.3    Voluntary Transfer Restrictions.    Any proposed Voluntary Transfer of any Shares by a Shareholder is subject to the following provisions:

(a) Before the Voluntary Transfer, the Shareholder must send an Offer Notice to the Other Shareholders who are parties to this agreement describing the Voluntary transfer (the "Offer"). If any term of the proposed Voluntary Transfer changes after the delivery of an Offer Notice, the Shareholder must promptly notify the Other Shareholders who are parties to this Agreement of the changes, and the subsequent notice will constitute a new Offer Notice for purposes of this Section 3.3(a).

(b) For a period of sixty days after the date of the delivery of the Offer Notice to the Other Shareholders who are parties to this Agreement, the Other Shareholders have the right to accept or reject the Offer in writing. . . .

(c) If the Other Shareholders do not accept the Offer to purchase all the Shares that are the subject of the Offer by the expiration of the time periods described in Section 3.3(b) or if before the time periods expire the Other Shareholders reject the Offer in writing, the Shareholder is entitled to sell the remaining Shares strictly in accordance with the terms contained in the Offer Notice.

also provided for a specific contractual remedy in the event of a putative voluntary transfer of shares in violation of that agreement as follows:

> 9.2 <u>Breach and Equitable Relief</u>. Any purported Transfer in breach of any provision of this Agreement is void, will not operate to Transfer any interest or title in the purported transferee, and will constitute an offer by the breaching Shareholder to sell his Shares to the Corporation at the purchase price per Share determined pursuant to <u>Section 7.1</u> above to be payable in accordance with <u>Section 7.2(b)</u>. In connection with any attempted Transfer in breach of this Agreement, the Corporation may refuse to transfer any Shares or any stock certificate tendered to it for Transfer, in addition to and without prejudice to any other rights or remedies available to the Corporation. Each party to this Agreement acknowledges that each other party will suffer immediate and irreparable harm if a party hereto breaches, attempts to breach, or threatens to breach this Agreement and that monetary damages will be inadequate to compensate the nonbreaching parties for any actual, attempted, or threatened breach. Accordingly, each party hereto agrees that each of the other parties will, in addition to any other remedies available to them at law or in equity, be entitled to specific performance or temporary, preliminary, and permanent injunctive relief to enforce the terms and conditions of this Agreement without the necessity of proving inadequacy of legal remedies or irreparable harm, or posting bond, any requirements to equitable and injunctive relief being hereby specifically waived.

Finally, the *Shareholders' Agreement* required the parties to mediate and arbitrate any dispute arising under the agreement. Specifically, the agreement provided in relevant part as follows:

> 12.5 <u>Mediation and Arbitration</u>. If a claim, demand, disagreement, controversy, or dispute (collectively, "Dispute") arises in connection with this Agreement or the breach thereof and if the Dispute cannot be settled through direct discussions, the parties agree to endeavor first to settle the Dispute in an amicable manner by mediation . . . . The mediation will be completed within thirty days of receipt of written demand for mediation. Thereafter, any unresolved controversy or claim relating to this Agreement or breach thereof will be settled by binding arbitration initiated by written notice by either party to the other of the intent to arbitrate. The arbitration will be held in Lubbock, Lubbock County, Texas, United States of America, and administered by the American Arbitration Association, in accordance with its Commercial Arbitration Rules, and judgment on the award rendered may be entered in any court having jurisdiction. . . .

4

Over the next four years, Appellee became dissatisfied with the way the Corporation was being managed under the terms of the *Voting Trust Agreement,* and in December of 2012, she opted out of that agreement.[7]  The next month, a special shareholder's meeting was called and the Bylaws of the Corporation were amended to expand the definition of a "Permitted Transferee" in Article 2 entitled "Defined Terms" of the *Shareholders' Agreement* to include "another Shareholder."

A short time later, by a letter dated February 28, 2013, Michael and Richard Byrne offered to buy Appellee's shares for $3,130,000.  By a letter dated March 4, 2013, through her attorney, Appellee "conditionally accepted" that offer, expressly reserving the "right to withdraw from the proposed transaction without penalty at any time prior to closing and receipt by her of the payment due to her under the terms of [that] offer."

Although Appellee and her attorney did not believe the right of first refusal provision of the *Shareholders' Agreement* was enforceable, "as a courtesy," they notified the other parties to that agreement of the Byrnes' offer.[8]  Thereafter, on March 7, 2013, counsel for the other parties to that agreement requested additional information concerning the "Offer Notice" and, at the same time, invoked their putative right to a period of time to consider the offer.[9]  The next day, Appellee's attorney provided the requested information while, at the same time, stating his opinion that the "purported

_____

[7] Appellee believed she had opted out of both the *Voting Trust Agreement* and *Shareholders' Agreement* thereby dispensing with the necessity of complying with the requirements of the *Shareholders' Agreement* regarding the sale of her shares.

[8] In Appellee's original pleading, she alleged the *Voting Trust Agreement* and the *Shareholders' Agreement* were unenforceable because she was induced into entering those agreements based upon false statements made to her by Nancy Higginson and the Corporation's attorney.

[9] Article 3.3(b) of the *Shareholders' Agreement* provides that the other parties to the agreement have "the right to accept or reject the Offer in writing" for "a period of sixty days after the date of the delivery of the Offer Notice."

5

Shareholder Agreement" was unenforceable and that Appellee would proceed to close "the deal by March 22, 2013." On March 18, 2013, counsel for the other parties to the *Shareholders' Agreement* purported to "**accept** the 'Offer'" at the price per share being offered by the Byrnes parties. The letter of acceptance set closing for March 22, 2013, at the law offices of Appellee's attorney.

Faced with competing claims for her shares, on April 11, 2013, Appellee filed a petition for declaratory judgment seeking a declaration (1) that the *Shareholders' Agreement* was unenforceable, (2) pleading alternatively, that she was entitled to withdraw from any agreement to sell her shares to the Byrnes parties, and (3) again pleading alternatively, that the remedy for a breach of the *Shareholders' Agreement* would be to compel her to sell her shares in the Corporation at the book value of those shares, as determined in accordance with Section 7.1 of that agreement.[10] Appellee also sought recovery of attorney's fees as authorized by section 37.009 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2015).

Appellants responded by filing their own counter-petition for declaratory relief seeking a declaration that (1) the *Shareholders' Agreement* was a valid contract that restricted Appellee's right to sell her shares in the Corporation and (2) the right of first refusal was triggered and accepted by the "Purchasers" (defined to include persons who were not parties to the *Shareholders' Agreement*). Appellants also sought specific

---

[10] Section 7.1 of the *Shareholders' Agreement* provides that the purchase price per share will be "the quotient of the Corporation's accrual basis book value as of the last day of the month immediately preceding the closing of the purchase of the Shares being purchased (determined in accordance with generally accepted accounting principles) divided by the total number of Shares then issued and outstanding for all shareholders of the Corporation, including shareholders of the Corporation who are not parties to this Agreement (determined in accordance with the Corporation's stock records)."

performance of Appellee's purported obligation to "transfer all of [Appellee's] shares in [the Corporation] to them" as well as recovery of attorney's fees pursuant to sections 37.009 (declaratory judgments) and 38.001 (written contracts) of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.009, 38.001 (West 2015). Finally, Appellants sought both a temporary restraining order and a temporary injunction. The last temporary restraining order was granted on May 14, 2013, and later extended by agreement to September 13, 2013. Ten days after the temporary restraining order expired, Appellee purported to transfer her shares to the Byrnes parties.

Having failed to stop the purported transfer to the Byrnes parties, Appellants amended their counter-petition to specifically allege that the transfer was void as per section 9.2 of the *Shareholders' Agreement*. On November 7, 2013, even though the Byrnes parties were parties to the litigation and the purported transferees of Appellee's shares in the Corporation, Appellants sought to compel arbitration of that portion of the dispute existing between Appellants and Appellee, in accordance with section 12.5 of the mediation and arbitration provision of the *Shareholders' Agreement*.

By order signed March 6, 2014, the trial court granted Appellants' motion to compel arbitration. In doing so, the trial court specifically decreed that it "does not compel the Byrne Defendants to participate in arbitration and specifically makes no ruling on the exclusion of the Byrne Defendants from arbitration as they have not requested to be included in any arbitration."

On April 7, 2014, mediation commenced before Randy Duke, a mediator for the American Arbitration Association. The parties were not able to resolve their issues.

7

Thereafter, on October 1, 2014, Appellants amended their petition in arbitration to "seek only actual monetary damages against [Appellee] which include but are not limited to economic damages from the dimunition [sic] in value of their respective shares, expectation and reliance damages, unjust enrichment, nominal damages, pre-judgment and post-judgment interest, attorney fees, and costs." In response, Appellee contended the *Shareholders' Agreement* was unenforceable and that, in any event, monetary damages were unavailable to Appellants because the parties had agreed that the sole remedy for a transfer in breach of that agreement was a declaration that transfer was void. At this point, unable to resolve their dispute, arbitration proceeded to a three-person panel of the American Arbitration Association.

Thereafter, on February 5, 2015, in response to a request from the arbitration panel, Appellants' counsel sent an email transmitting to the panel a proposed *Arbitration Award* which purported to be a settlement of all disputes at issue in the arbitration proceeding.[11] This document was not signed by the parties, but it was signed by counsel for both Appellants and Appellee, "approved as to form only." The *Arbitration Award* did seven things: (1) it confirmed that the *Shareholders' Agreement* dated January 1, 2008, was "valid and enforceable," (2) it provided that Appellee breached that agreement by "failing to sell and transfer her shares in [the Corporation] to [Appellants]," (3) it confirmed that Appellee's purported transfer of shares to Michael Byrne and Richard Byrne was void, (4) it provided that Appellants were entitled to

---

[11] The parties disagree on whether the proposed *Arbitration Award* constituted a Rule 11 settlement agreement. The email from Appellants' counsel to the arbitration panel provides in part "please find the Arbitration Award approved as to form by the attorneys of record." Subsequent emails between counsel for Appellants and counsel for Appellee were also introduced before the trial court for purposes of establishing that a settlement agreement had been reached. Whether there was an enforceable settlement agreement or not was an issue ultimately determined by the trial court in favor of Appellee.

"specific performance of the sale and transfer of [Appellee's] shares in [the Corporation]," (5) it provided that Appellants were not entitled to "a monetary damage remedy against [Appellee] for breach of the Shareholder Agreement," (6) it confirmed that "[t]hese findings do not preclude all or any of the other remedies that may be available to [Appellants] either under the Shareholders' Agreement, or otherwise available at law or in equity," and (7) it awarded Appellants the sum of $400,000 for "arbitration fees, costs and reasonable and necessary attorneys' fees attributable to [their] claim against [Appellee]."

Despite the joint representation of counsel that the dispute between Appellants and Appellee had been settled, the arbitration panel refused to accept or sign the *Arbitration Award* because it was not willing to approve the form of the award as presented. As a result, the parties proceeded with arbitration.[12] Following three days of testimony that commenced on May 26, 2014, the arbitration panel issued a "standard award" on June 26, 2015, finding Appellee liable to Appellants for "the total sum of $2,000,000 in damages plus legal fees in the amount of $322,023.25," and costs of $5,725.

On July 7, 2015, Appellants filed their *Petition to Confirm and Enforce Award of Arbitrators,* seeking a final judgment against Appellee in accordance with the award of the arbitration panel. Appellants also sought to sever their claims against Appellee from the remaining claims or causes of action then existing between Appellee and the Byrnes

---

[12] According to Appellee's counsel, she was unwilling to consent to a change in the form of the settlement agreement as presented because of how it might impact the remaining non-arbitration claims still pending between her and the Byrnes parties. When Appellee refused to change the form of settlement as presented, the arbitration panel insisted that the matter proceed to a hearing.

parties.[13]  In opposition thereto, on August 5, 2015, Appellee filed a motion seeking to vacate or modify the arbitration award on the grounds that the arbitration panel exceeded its authority.  Appellee later filed her *Amended Motion to Vacate or Modify Arbitration Award* on August 19, 2015.

On August 25, 2015, a hearing was held on the opposing motions.  At that hearing, Appellee's counsel testified there was a settlement agreement and he argued the arbitration panel had exceeded its authority by not accepting that settlement. Appellee's counsel alternatively argued that if a breach of the *Shareholders' Agreement* occurred, then the transfer of shares to the Byrnes parties was void, and as a result, Appellants suffered no damages.  The trial court took matters under advisement.  By order dated September 1, 2015, the trial court denied Appellants' petition to confirm, granted Appellee's motion, and vacated the award of the arbitration panel.[14]  By a separate *Scheduling Order*, the trial court also scheduled the dispute for trial.  This interlocutory appeal followed.

ISSUE

Appellants maintain the trial court abused its discretion in failing to confirm the arbitration award because the arbitration panel did not exceed its authority.  Appellee defends the trial court's order vacating the arbitration award by arguing the arbitrators exceeded their powers in (1) awarding damages to Appellants for a void stock transfer and (2) refusing to accept the parties' settlement agreement that would have resolved their disputes.  Based on those same arguments, Appellee contends the trial court

---

[13] The trial court declined to rule on the motion to sever.

[14] The order does not recite whether the trial court applied the Texas Arbitration Act or the Federal Arbitration Act; however, Article 9.3 of the *Shareholders' Agreement* provides for application of "the laws of the state of Texas."

10

correctly denied Appellants' petition to confirm the arbitration award. By reply brief, Appellants respond that (1) Appellee's argument that the stock transfer was void is not a complaint that the arbitration panel exceeded its powers; (2) pursuant to paragraph 9.2 of the *Shareholders' Agreement*, Appellee's attempted transfer to the Byrnes parties was void but Appellants nevertheless suffered damages compensable under Article 9.2; and (3) no enforceable settlement agreement existed as to the substance of the award.

STANDARD OF REVIEW

We review the trial court's decision to vacate or confirm an arbitration award *de novo* based on the entire record. *Cambridge Legacy Group., Inc. v. Jain*, 407 S.W.3d 443, 447 (Tex. App.—Dallas 2013, pet. denied). A trial court shall confirm an arbitrator's award upon a party's application, unless grounds are offered for vacating the award. TEX. CIV. PRAC. & REM. CODE ANN. § 171.087 (West 2011); *Callahan & Assocs. v. Orangefield Indep. Sch. Dist.*, 92 S.W.3d 841, 844 (Tex. 2002). Arbitration awards can only be vacated under very limited circumstances. *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002). Additionally, review of an arbitration award is "extraordinarily narrow." *E. Tex. Salt Water Disposal Co. v. Werline*, 307 S.W.3d 267, 271 (Tex. 2010).

Conversely, section 171.088(a) of the Texas Civil Practice and Remedies Code provides the grounds for which a trial court "shall" vacate an arbitration award. TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(3)(A) (West 2011). Both the Texas Arbitration Act and the Federal Arbitration Act authorize courts to vacate an arbitration award whenever arbitrators exceed their powers. *Id.*; 9 U.S.C. § 10(a)(4) (West 2009). Because arbitrators derive their power and authority from the parties' arbitration

agreement, an arbitrator's power and authority depends on the provisions under which the arbitrator was appointed. *Nafta Traders*, *Inc. v. Quinn*, 339 S.W.3d 84, 90 (Tex. 2011). Arbitrators exceed that authority when they disregard the contract and decide matters not properly before them. *D.R.-Tex.*, *Ltd. v. Bernhard*, 423 S.W.3d 532, 534 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). In that regard, the appropriate inquiry is not whether the arbitrator decided an issue correctly, but instead whether the arbitrator had authority to decide the issue at all. *Id.* An arbitrator's award in excess of its jurisdiction is void. *Gulf Oil Corp. v. Guidry*, 160 Tex. 139, 327 S.W.2d 406, 408 (1959).

RULE 11 AGREEMENTS

Rule 11 of the Texas Rules of Civil Procedure provides that "no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record." TEX. R. CIV. P. 11. A settlement agreement must comply with Rule 11 to be enforceable. *Padilla v. La France*, 907 S.W.2d 454, 460 (Tex. 1995); *West Star Transp.*, *Inc. v. Robison*, 457 S.W.3d 178, 191-92 (Tex. App.—Amarillo 2015, pet. denied). A Rule 11 agreement need not be signed by the parties if it is signed by their duly authorized attorney. *Padilla*, 907 S.W.2d 460 (holding that a series of letters between counsel was sufficient to constitute an agreement satisfying Rule 11).

ANALYSIS

Here, Appellants focus on the propriety and great deference a trial court must accord an arbitration decision. They argue, rightly so, that because of the deference to

12

be given arbitration awards, judicial scrutiny of an award must focus on "the integrity of the process rather than the propriety of the result." *TUCO, Inc. v. Burlington N. RR. Co.*, 912 S.W.2d 311, 315 (Tex. App.—Amarillo 1995), *modified on other grounds*, 960 S.W.2d 629 (Tex. 1997). They further argue, again rightly so, that a trial court may not substitute its judgment for that of the arbitrator merely because it would have reached a different result. *Jones v. Brelsford*, 390 S.W.3d 486, 492 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Bailey v. Williams & Westfall*, 727 S.W.2d 86, 90 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

At issue in this proceeding, however, is not whether the arbitration panel correctly or incorrectly construed the relative rights of the parties under the *Shareholders' Agreement* and then determined an appropriate disposition of an existing dispute; the issue is the very integrity of the process itself. Whether there was a justiciable controversy and, concomitantly, whether the panel had any authority to make a decision at all was a matter of jurisdictional significance. As such, the issue before the trial court was whether there was an existing dispute to be arbitrated, not the propriety of the ultimate decision of the arbitration panel.

Although both federal and Texas law favor arbitration, trial courts are "free to scrutinize the [arbitration] award to ensure that the arbitrator acted in conformity with the jurisdictional prerequisites" of the agreement giving rise to the arbitration proceeding. *Delta Queen S.B. v. District 2 Marine Engineers & Beneficial Ass'n.*, 889 F.2d 599, 602 (5th Cir. 1989) (stating that "[w]here an arbitrator exceeds his contractual authority, vacation or modification of the award is an appropriate remedy"). Here, Paragraph 12.5 of the *Shareholders' Agreement* specifically provides for arbitration "if the Dispute

13

(defined as 'a claim, demand, disagreement, controversy, or dispute') *cannot be settled . . . ."* (Emphasis added). Settlement, therefore, deprives the arbitrator of any authority to act and the trial court was within its authority to determine whether or not a settlement existed prior to the proceedings before the arbitration panel.

In determining whether or not the parties had entered into a binding settlement agreement, we must give great deference to the decision of the trial court. The trial court heard the evidence, judged the credibility of the witnesses and the weight to be given to their testimony, and resolved that issue against Appellants. Having found that the parties had settled their dispute, the trial court did not abuse its discretion in finding that the jurisdiction of the arbitration panel ended. Because the arbitration panel lacked the jurisdictional prerequisite of a matter in controversy, the trial court did not err in either denying Appellants' motion to confirm the arbitration award or in granting Appellee's motion to vacate that award. Appellants' issue is overruled.

CONCLUSION

The trial court's *Order Granting Amended Motion to Vacate Arbitration Award and Denying Petition to Confirm and Enforce Award of Arbitrators* is affirmed.


Patrick A. Pirtle
Justice


14